Case 14-3870 USA v. Kenneth Embry Case 14-3871 USA v. Deon Levy Case 14-3880 USA v. Camille Harris That case to be submitted on the briefs or argument for the first two cases are 10 minutes for each defendant, 20 minutes for the appellant. Mr. Belli, you may proceed. Thank you. May it please the Court, my name is Dennis Belli. I represent Kenneth Embry who appeals from multiple convictions arising out of a mortgage fraud prosecution. I wish to reserve one minute of rebuttal time. Mr. Embry's brief raises multiple issues. Obviously, I cannot address all in 10 minutes. But I would like to initially address the sufficiency of the evidence argument and first focus on the conviction for conspiracy to commit money laundering. The essence of money laundering is concealment of the source of illegally gotten funds. Now, when the underlying crime is a fraud, theft-related type offense, typically the underlying offense is going to involve some element of concealment activity, is part and parcel of the underlying offense or constitutes a separate offense. And it's our position here that there was no independent proof of an offense of money laundering or conspiracy. This Court has addressed this issue in two cases. In McGehee, U.S. v. McGehee, the Court stated that checking account transactions designed to convert funds, illegally gotten funds, into liquid assets is not money laundering. More recently, in Falkenbury, a case actually cited by the government, the Court reversed a money laundering conviction that was based on the use of false documentation to obtain investor funds. So, in this case, the government's theory was that Mr. Embry and his co-defendants sought to obtain mortgage lender funds illegally through fraud and then distribute those funds to an illegal transaction and then to disperse funds among the alleged participants. And that was the extent of the activity that the government alleges constituted money laundering. Our position is that that simply does not hold up under the cases cited, Falkenbury and McGehee. Well, can you explain more particularly why it is not money laundering? Because money laundering was intended to apply to situations where somebody, let's say in a drug case, illegally makes money and then attempts to convert that money into other assets, a home, a vehicle, in order to hide the source, the illegal source of the funds. But that's not what occurred here. What the government's theory was that the money was simply dispersed from this DBA account that Mr. Embry allegedly set up and once the money got into the hands of the various participants, there's no other evidence as to what was done with the money. Presumably it was spent. That simply is not money laundering. You're adding $450,000 to Marabil's account? That's true. Why isn't that? I understand the argument with respect to the $340,000. It seems to cohere with your argument. But then he went ahead and further transferred it. It sounds like that second stage that you just described. Well, Mr. Embry did not do that. He allegedly... He didn't do that transfer? I just asked you. No. The government's theory is that he maintained that Wolfco account, which Wolfco being the contractor. And then some of that money went to Marabil and at that point... You say it went. That's in the passive. Who caused it to go? Well, my client denies involvement, but the government's theory is... There's evidence of that. Yes, that's true. Why isn't that money laundering? Because it's dispersing the funds among the participants. And Marabil is the alter ego of Dion Levy, the co-defendant. I don't think it's any different than co-conspirators meeting to disperse cash proceeds. It's just a little more sophisticated, but it's just not money laundering. We're getting right to the core of this. Disperse is the whole issue. I mean, in some kinds of dispersal, it is money laundering, where you give it to somebody rather than the people it belongs to. Well, but a fraud scheme involves theft, so the money is not going to go to the people... So you steal the money. That's not money laundering. Well, let's... If you put the money in some bank rather than giving it back to the person you gave it, who you stole it from, why isn't that money laundering? I'm assuming it's not, but why isn't it? Because it's not designed to hide the source of the funds once the funds... That's part of what it is when you're placing... Well, then, in your example, why was that money laundering? You gave an example earlier. You say the classic money laundering is when you do X and then you do something else to hide it. Right, to convert the funds into other property. So do you have to have a third party involved in order to have money laundering, whereas your situation just involves the defendants? No, not necessarily. I mean, if a defendant takes his money that he earned from illegal activity, and then through a series of transactions, after the offense is committed, he attempts to hide the true source of the money, that would be money laundering. But that's not the government's theory here. The government's theory is that this scheme ended when the money was dispersed among the alleged participants. And there was no evidence of further transactions once the money is dispersed. That's why it's not money laundering. But in answer to my question, do you have to have a third party, you said no. So it could be dispersed among the participants and constitute money laundering. You're just saying it doesn't here. No, I don't think it would constitute money laundering. You do need to have a third party involved, no? But true, in a sense of, let's say that I take illegally derived funds and use it to purchase a property to hide the money. Well, you're going to need the assistance of a real estate broker and the other people involved in the transaction. But that's after the fact. So yes, I suppose in that sense, you would need some third party to assist you, although not necessarily a criminal actor. Right. This particular argument just relates to one of the counts, is that correct? Yes, that would be count three. Speaking hypothetically, if we agreed with you on this one, but not on any of your other arguments, what would be the relief we would get? The consequences would be a need for resentencing, because the way the guidelines are structured in a fraud case, if an individual is convicted of a money laundering offense, it adds two more levels to the guideline score. So in this case, it would probably make a difference of about a year in the sentence, the prison sentence. And could he be retried? Well, yes. No, no. If the court finds that the evidence was insufficient, then the double jeopardy principles would preclude a retrial on that count. Why isn't the writing of, after the money went into the account, the writing of checks to cash and then obtaining cashier's checks to get the money to its intended target, why isn't that money laundering? Because in the words of this court's decision in McGehee, it still remains part and parcel of the underlying offense. And in McGehee, the court said even if there's a trivial intent to conceal, and in Falkenberry, the court stated as long as it's not the dominant purpose, it is not money laundering. It's designed to complete the underlying offense. We also challenge the wire fraud and wire fraud conspiracy counts, counts one and two. And we do that, we're not arguing he says, she says. We would submit that the government's proof failed to show that Mr. Embry either caused this wire transfer from Ohio to South Carolina, that he actually did it, or that he caused it to happen. Because in this case, there simply was no evidence as to exactly what had occurred. The invoice in question for Wolfco has a South Carolina address. The money could have been dispersed by means of a check at closing, or it could have been mailed. In this case, it was transferred by wire, and the government never elicited testimony, number one, regarding what in the ordinary course of business occurs at a closing to distribute money to a contractor, and number two, they failed to show that even if this is part of the ordinary course of business, that it was reasonably foreseeable to Mr. Embry that the money would be dispersed that way. Counsel, you'll notice that your red light has come on if you are saving your rebuttal time. Thank you very much. May it please the court, Erin Flanagan, on behalf of Dionne Levy, who is a co-defendant in this case, and his case number is 14-381, I'm sorry, 3871. Money laundering aside, and the idea that Ameribild was the alter ego of Dionne Levy aside, because nothing in the over 800 pages of transcripts allows that. And by transcripts, I mean the motion to suppress, and I mean the entire trial transcript allows the idea that Dionne Levy was the alter ego of Ameribild. That was Camille Harris. She was a president. She worked with Kenneth Embry, who had Wolf Co. to get this property actually in Waxhaw, North Carolina, where this is a little bit of a spaghetti bowl of a case. But at the basics, it's a Fourth Amendment case. And it has to do with the motion to suppress that was brought by Dionne Levy and Kenneth Embry, which was granted by Judge Gahn on all Google and Microsoft emails that they had. The judge's order has no dates. It's just all of the email information is suppressed. That's fine. Actually, that was good for the trial lawyers. I was not involved in the trial. That's good for the trial lawyers. Somehow, Ms. Summer Bay, or Shannon Lee, or Shannon Woods, who was a felon under indictment at the time, came about, somehow came to the Northern District of Ohio from North Carolina, and the transcript does not tell us how, and testified against my client, Dionne Levy. And I have thought, and I've read the transcript three times. I'm a former federal clerk. I totally focus, and I can't see how the government got her, Shannon Bay, unless through the Google and the Microsoft emails that were suppressed by Judge Gahn. She didn't come voluntarily. She came, but all of those emails were suppressed. Nevertheless, she took the stand. What are you suggesting? That they used the information even though they didn't proffer it? Yes, sir. Is that a violation of the Fourth Amendment to use suppressed evidence? Yes. Nixby Wilson. And the evidence is just, it must have happened? It must have happened, and why I call it a spaghetti bowl is because then this gets into ineffective assistance of counsel, that the counsel at the time, and again, it was not me, did not object to where did Summer Bay come from? She's in North Carolina. She didn't voluntarily come up to the Northern District to testify against my client. Somehow they found her, and there's no way other than through emails that they would have done that. I can't find it in the transcript. I have had discussions with the government, and we just don't know. So the trial counsel for your client did not object? That's correct. So aren't we in the Court of Appeals in a difficult position to consider your argument if no objection was raised, so no evidence was put forward to show that this production of Summer Bay was due to misuse of the emails that were suppressed? I agree that you're in a difficult position, but it's also a manifest injustice, and it needs to be addressed somewhere, because Judge Gan did put together an order dated I apologize, in September of And she didn't have dates on those emails. She just said everything from Microsoft, everything from Google is suppressed. But there's no testimony that Summer Bay showed up because the government used the emails to find her, right? So we have to draw inferences in order to accept your position, right? That's correct. Counsel, where is the argument that you're currently making in your brief? In terms of Summer Bay's appearance was a result of suppressed evidence. That's your argument now today, right? One moment, Your Honor. I apologize. Well, it goes to Where the argument is made. I'm looking. I didn't focus on that argument when I read your brief. I'm wondering where it is. Well, it would be in the Ineffective Assistance of Counsel document number 33, pages 31-32. You've just presented it to us as an Ineffective Assistance of Counsel claim, is that correct? In your brief. Well, also whether the district court erred by allowing testimony as to the Wolfcolt invoice. Because Summer Bay No, it's pages It's document 33. I'm looking in your brief now is what I'm looking for. Oh, 25 in my brief to 29. 25 to 29, but 25 to 27 is Ineffective Assistance of Counsel. So you're saying the extent to which you raised this argument is in 28-29. I'm sorry to burden the court. So in order to determine whether you've presented this in your brief, we'll look at pages 28 and 29. Well, Are you looking at my page numbers or the document numbers? I mean, you really have to present arguments in your briefs if you're going to expect us to revert. It's in whether the trial counsel ineffectively assisted Mr. Levy because they allowed The trial counsel allowed Summer Bay to testify to something that was outside the scope of the suppression and whether the info, the Wolfcolt invoice would have been admitted. We'll look at that for that purpose. All right. Thank you, Your Honor. Thank you, Counsel. May I proceed, Your Honor? Yes. Thank you. Good morning. May it please the court, my name is Robert Patton on behalf of the United States. Good morning. Your Honor, there was sufficient evidence of the crimes alleged in the indictment in this matter through the testimony of Summer Bay that was just discussed before I approached the court. I know that it was stated in the briefing that there was insufficient evidence with respect to defendants Embry and Levy. The government would respectfully cite this court to the record and to her testimony. In particular, I would cite the court to record page 2706 where Summer Bay says that they could not direct the money to AmeriBuild because the lender would know that AmeriBuild was associated with Camille Harris as they had her fictitious records with respect to her earning income and ownership of the company. So the money had to be diverted to the Wolfcolt invoice. Why wasn't that part of the initial fraud, I guess is the question I have. Well, that is part of the fraud, Your Honor. So you're talking about sufficient evidence for the fraud right now? Yes, Your Honor. I'll wait until you get to money laundering. Yes, Your Honor. With respect to the initial fraud, I would also respectfully cite the court to the record 2708 where Summer Bay recounted conversations that she had with defendants Levy and Embry where they knew the deal needed to be structured to get money out of the Finally, with respect to defendant Embry, at the record 2568-69 in Summer Bay's testimony, she addressed that Embry provided the Wolfcolt invoice at the point of closing. Are you going to address the money laundering? Yes, Your Honor. With respect to the money laundering, I would cite the court to the testimony of Special Agent Sean McGovern. As Judge Rogers pointed out earlier in the argument, you had asked counsel about a transfer of $150,000. I double-checked the record. That is a fund transfer that came out of the Wolfcolt account. It was not a check, Your Honor. It was a fund transfer that went from the Wolfcolt account to the Ameribil account, and that's the record 2574-2575 page ID number, Judge Rogers. Is that your basis for saying that this is money laundering? Yes, Your Honor. The money is then returning back to Ameribil. It's money that's already been defrauded and it's being converted into something else. Yes, Your Honor. In tracing that money through... Did you then put it in your bank account? No, Your Honor. How is this different from that? Well, Your Honor, in this case, we have the transfer of money from the Ameribil account to Camille Harris' personal account. That occurred two days later on January 9, 2008. That just sounds like he's collecting the money that he's defrauded. Correct. But he's running it through various entities as he's doing so, Judge Rogers. So if you steal, to use my simplistic analogy, if you steal money, you put it in your bank and then you transfer it from one of your banks to another one of your banks, and then take half of it and put it in a third one of your bank accounts, that's money laundering? Or it might be money laundering? Or it is money laundering? Or it isn't? I would say it's not, Judge Rogers. So how is what you're talking about different from that, then? Well, because we have the money hitting the WolfCo account, as we've talked about. Then we have the money going into the Ameribil account, which is the $150,000 that we just spoke of. And then we have the money going into Camille Harris' personal account. So the government would submit that Ameribil is a corporate entity separate and distinct from Camille Harris. She's a pro-conspirator, though, right? Yes, Judge. And wasn't Ameribil the creature of Harris and Levy? It was, Judge Moore. Yes, it was. So why isn't it all staying within the participants in the conspiracy? Well, Your Honor, I think the purpose is not whether it's staying within entities controlled by individuals in the conspiracies. It's the fact that it's a corporate account. It's a separate entity, separate and apart from the individuals. Ameribil was not charged as a corporate defendant in this case. Camille Harris and Mr. Levy were charged as individual defendants. The money was run through a corporate account. That's the basis of the government's theory. So if it had been run through an individual account, it would not be money laundering, but because it's a corporate account, it is money laundering? Yes, Your Honor, for the purpose of concealment, yes. And what case do you rely on for that? Well, Your Honor, I would look at this court's decision in Falconberry, and that would be the basis of the government's position on that point. So with respect to the objection regarding the WolfCo invoice, which is the next argument that's made, I would cite the court to the record 151, page ID 1661, where Judge Gahan specifically said that the WolfCo invoice was not suppressed. If the court looks at the record, the court will see that the motion to suppress was limited to the e-mail accounts and the administrative subpoenas that were served on Google and Microsoft for defendants Levy and Embry. I would also note that the argument has been made that the government's trial brief was misleading and untimely as to the independent source doctrine. The government filed that trial brief two days after Judge Gahan's order, where the court walked the district court through an independent source analysis, placing all the parties, all defendants in the court on notice, that did not view the fairway documents as subject to the suppression order. I would also ask the court to look to the point that the WolfCo invoice was not raised as an issue until post-trial pleadings were filed by the defendants in this case. They did not object or respond to the government's trial brief addressing the issue. They certainly did not object when the exhibits lists were exchanged three days before trial. They did not object when the exhibit was offered, and I'm referring to exhibit 203.2. As a matter of fact, defense counsel used that exhibit to cross-examine two of the witnesses during the case. So would we review this issue for plain error then if there were no objections raised below? Yes, Your Honor, you would. Thank you, Judge Moore. And your opponent, Ms. Flanagan, argued today that all of Summer Bay's testimony must have come from, or Summer Bay coming to court or coming to the government's attention must have been due to the emails. How do you respond to that argument? Let me say, Your Honor, I was not entirely prepared to deal with that argument. I did not read that in her motion, but as the trial counsel in the matter, I would cite the court to the fairway documents where she would have been listed as the realtor involved. I would also cite the court to the American Home Closings documents, which was the escrow agent for the closing of the transaction, where she certainly would have been listed as the real estate agent. So I dispute the fact that the emails would provide the sole basis of identifying her as a witness at trial in this matter, Your Honor. So with respect to that, again, the court, that is Judge Gahan, said that that was not suppressed and they did not object until post-trial pleadings. Could I back up onto the money laundering again? Yes, Judge. I'm thinking now about the issuance of the, I think it was $181,000 check for cash, and there were some other checks for cash, and then cashier's checks for similar but not exactly those amounts. I think one went to Adelstein. Does the government view that as part of the money laundering? It does, Your Honor, and thank you for pointing that out. That would be the $181,000 that was paid back to repay Mr. Bruce Adelstein, who was a court's witness, who put down the down payment for the transaction, if that's what you're referring to, Judge Patchelder. And also, that deal was arranged and Monty Warren, who testified at trial, was also given $5,000 along with another person for setting that up. So that would be part of the money laundering, and it would be the distribution of funds to conceal the fact that they didn't have the money to make the down payment. Is that what you're speaking of, Judge? Well, not conceal the fact that they didn't have the money, but because money laundering, I thought, was concealment of the source. And so I guess I was wanting you to walk me through why, if it is the government's position, why the issuance of a check for cash and the subsequent obtaining then of a cashier's check qualifies. Well, Your Honor, it's my recollection and it's my notes that there were two checks that came, well, there were actually three checks that came from the Wolfco account. Government's Exhibit 1.305 went to Mr. Adelstein. That's the $181,000 check that I mentioned a moment ago. That's the record $2,569 through $2,070. Then there were two more checks that Mr. Embry wrote. One he wrote it to himself as the payee on the check, and the other one he wrote to cash. So there were two checks for $2,500. Is that what you're speaking of, Judge? Okay, but the $181,000 check, I thought that that was initially written for cash and then there was a cashier's check obtained. Am I wrong about that? I would have to double-check the record, Your Honor. My note is that there was a check written to Mr. Adelstein from the Wolfco account to repay him for putting forth the money for the down payment. I may just be mistaken about the facts on that. Thank you. Yes, Judge. Thank you. So with respect to the next argument raised by counsel, Mr. Embry makes an argument that the e-mails were improperly excluded from the indictment. It's the government's position that doing so complied with Judge Gaughan's order, ordering suppression of the e-mails. The indictment was redacted. It was sent back to the jury without reference to the e-mail accounts, without objection, and that analysis would be under plain error as previously noted with respect to another issue. There's also the matter, Your Honor, of the sleeping jurors, and I know that that occurred in the or that was discussed, I should say, in the briefing. It's the government's position that that issue should be evaluated under plain error. Not only did counsel reject a request to dismiss the sleeping juror, but the other defendants' counsel went along with it. Which counsel objected to dismissing the sleeping juror? No one objected, Your Honor, on the record. There was an offer that was made by Judge Gaughan that if the parties agreed that she would dismiss this sleeping juror. The government immediately agreed to it and I said that the government would do that. Counsel for Ms. Harris declined to accept that offer. However, the counsel for the other defendants neither objected to the instances, I think there were three to four instances where the jurors were sleeping, nor did they move for a mistrial. And counsel for Ms. Harris did not object when those instances happened. It's the government's position that in the record, when it was noted that there were at least one, if not two, jurors sleeping, that that would have hurt the government, and that the first instance was during the direct of the government's witness, Minnick. Next was during the cross-examination of Special Agent Sean McGovern. The third instance was at the closing of the government's, or at the ending, I should say, of the government's first close, and during the middle of Defendant Levy's close. Well, couldn't there have been information helpful to the defense in those instances where the juror was sleeping, even though it was the government's witnesses? Yes, Your Honor. Yes. But it's the government's position in this case that based on this court's decision in U.S. v. Carr in 1993, that in that case the district court called to the attention of the defendants of a sleeping juror, and they did not choose to act going forward. I would also note that the... Well, is that case dispositive and binding on us? It is not, Your Honor. So we need to think logically whether or not the fact that one or two jurors were sleeping in the evidentiary portion and closing argument portion of the trial means that at least under, I assume, plain error standards, the person should be entitled to a new trial. I would say that would not be appropriate in this case, Your Honor. Not only does it not meet the plain error standard, but my note and recollection of U.S. v. Carr is that removal is warranted if it's impossible for the jurors to perform their duties, and there's no evidence in the record that there was a substantial period of them sleeping, and the instances were sporadic. Does the record show what was said when the jurors were sleeping? My reading of it, no, Your Honor. And tell me if I'm wrong. I'm assuming what happened is that it came to the judge's attention that a particular juror was sleeping, and the judge then said, jurors, you need to wake up, and somehow or other that juror was nudged or something like that. That's exactly how it happened, Judge Moore. So we don't know when that juror started to fall asleep and exactly how much that juror missed. And am I right that it was the foreperson of the jury at one point who was sleeping? It was, Judge. Yes, it was. But we don't know exactly what portions of the record or of the evidence that would be beneficial to the government or the defense that juror or the other juror may have been nodding off. You're correct, Judge Moore. So the next issue... Isn't it terribly troubling that jurors were definitely sleeping? I mean, there doesn't seem to be any doubt that there was sleeping. That's correct, Your Honor. The record reflects it is troubling, yes. It is, and I think that was the basis of Judge Gaughan making the offer to defense counsel that if the parties agreed that she would remove that juror, and that was an offer that was declined by counsel for Defendant Harris. So now, having been offered a remedy by the district court that was declined, now they use that as a basis for appealing. Well, why does it have to be unanimous among the defense counsel to excuse the juror? Why shouldn't one of them be able to obtain the juror's dismissal from the case? Judge Moore, I'm unaware of any authority that says it has to be unanimous. I agree with you. That was the offer that was posed by Judge Gaughan. So what you're saying is that Judge Gaughan offered to remove the juror. One defendant objected, and neither of the other two said, yeah, get rid of the juror. Well, let me be clear, Judge Batchelder. What happened was when this happened the second or third time, Judge Gaughan said, if the parties agree, I'll remove juror number, whatever that number juror was. The government immediately agreed. Counsel for Embry and Levy agreed. Counsel for Harris declined the offer that was extended by Judge Gaughan in that instance. So Embry and Levy agreed to dismiss the juror, and they're the ones who are complaining now that the juror wasn't dismissed. Correct. And so Harris unilaterally, her counsel unilaterally, caused this juror to stay on. Yes, that's correct, Your Honor, but I would also note that the record doesn't reflect any objection placed on the record by counsel for defendants Levy and Embry as to keeping the juror on in any of the instances. They agreed to dismiss the juror, which would suggest that they thought that was a good thing to do. Yes, that's correct. But then you're saying there's a duty on their part to object to the ruling of the district court. Yes, Your Honor, to preserve that, and that's why it's under plain error. They went along effectively with the declination of counsel for defendant Harris by not objecting, by not asking for a mistrial, by not objecting during any portion on the record when sleeping was noted because it did occur at the end of the government's close, first close, and so that's why they're placed under the same plain error analysis as defendant Harris in this matter. I took Judge Moore's question earlier to be why isn't it plain error, not is it plain error. Yes, Your Honor, it's the government's position that it is plain error. The standard is plain error, but you don't say that the standard is met, do you? No, it's not, Your Honor. Why not? I thought that was the thrust of Judge Moore's earlier. Maybe I misunderstood. No, that was the question. Why isn't it plain error? Oh, I misunderstood. It's plain error. It doesn't answer it to say we win because the standard is plain error. You have to win under the plain error standard. I mean, we're speaking in jargon here. My apologies, Judge Moore. I didn't follow your question. You're asking me, Judge Rogers, why it isn't plain error. Correct. Well, there was not an abuse of discretion by the trial court because there was no objection made. But whether there was an objection made goes to the standard we apply. Now I want to apply the standard. I understand. The judge knows there's no objection, but sees something. Why doesn't the judge have to do it in order to meet the criteria for plain error, which I can't say them off the top of my head, but they're well known to all of us. Correct. Well, Judge, it's not plain error because Judge Gahan was in the best position to see whether the defendant's substantial rights were affected. We can't say that it's not plain error because the district judge made the decision because then nothing will be plain error. I understand, Judge. And so going through the steps, was it error not to excuse the juror? My question would be, of course, wasn't it error because a sleeping juror should not be retained on a jury? I understand. So how do you respond to that? Don't you agree that it was error to retain the juror? Well, no, it wasn't because, again, part of the standard that this court has announced is that, and let me find my note here, is that with respect to that issue, that it has to be unduly or denied the defendant a fair trial under the Carr case. So these defendants were not denied a fair trial. And, again, I know we've had some discussion about the amount of time they were sleeping and so forth. There's nothing in the record that reflects that they were sleeping for a sufficient amount of time that these defendants were denied a fair trial. And that's why it's not plain error. So, Your Honor, unless there's anything else, I will yield the balance of my time. I see I'm out of time. Thank you very much. Thank you, counsel. Let's make a couple of brief points. Judge Rogers, with respect to this suppression issue, Mr. Embry has raised the issues as substantive claims at pages 27 through 33 of Embry's brief. And we've cited case law that indicates that any defenses like independent source, inevitable discovery, that the government wishes to assert must be raised in the pretrial proceedings. With respect to the sleeping jurors and whether this should be reviewed for plain error or as reversible error, in our reply brief we quote criminal rule 50- That argument only went to Levy. That argument that she's making goes to all of the defendants. Well, I didn't get a chance to orally argue it, but I understand. Yes. Yes, we would maintain that. Just very briefly, in our reply brief we quote rule 51-B, criminal rule, and it states a party may preserve a claim of error by informing the court when the court ruling or order is made or sought of the action the party wishes the court to take. And then we've cited a Seventh Circuit case, Bartlett, which construed that rule and says it only requires that the party make his position known. It does not, quote, require a litigant to complain about a judicial choice after it has been made, unquote. We'd ask that the court reverse- But did you ever make plain that you thought unanimity should not be required of all parties to excuse a juror who is sleeping? Oh, yes, that's a main thrust in Mr. Embry's briefs. You told the district court that? Oh, no, I wasn't a trial counsel. Well, your predecessor. Did your predecessor alert the district court to the error of her ways in requiring unanimity? No, because that issue of unanimity only came up in the decision denying the motion for a new trial. At least that's the way I read the record. No, it wasn't at the time when Embry and Levy wanted to excuse the juror. The problem with this record is I think this particular district judge tends not to put everything on the record, but when you reconstruct the motion for a new trial with the government's response and its concessions and its response, it becomes clear, at least I think, that two of the attorneys wanted the juror excused, one didn't, and Judge Gahn in her order denying the motion for a new trial says, I didn't dismiss the juror because there was a lack of unanimity among defense counsel. But there's no contemporaneous record from the district court as to this important ruling about the sleeping juror. No, the only thing that appears in the record is the fact that jurors were sleeping and that the judge was upset about it, and then one of the attorneys in closing argument was upset. He looked at the juror and says, ma'am, I need you to pay attention to what I'm saying. And the one attorney was which person's attorney? The government or one of the defendants? Oh, one of the defendants. One of the defendants, but not your client? No. Thank you. Can I ask about part? You're saying that the argument that your co-counsel was making was brought in pages 30 to 34 of your brief. Is that right? 27 to 34. We've raised it twice, once in terms of the denial. When it's admitting, 27 is when it's admitting the invoice and other documents. So that sounds like an argument going to the admission of these documents, whereas I thought her argument had to do with whether Shannon appeared. Well, but then at page 30, there's the issue number. That's what I asked. If at all, it's in 30 to 34. Right. Correct. There it seems to be talking about suppressed. You're objecting to evidence that was previously suppressed, but which is now being admitted, right? That's correct. The argument is that the motion to suppress. I took that to relate to the WolfCo invoice. It does because the motion asked to suppress the e-mails and all derivative evidence, and we believe that her testimony. I understand that's what the suppression, but then the challenge in your brief was to the admission of something which had previously been suppressed, right, or not? Right, that the government introduced evidence that was suppressed. Which I took to be the WolfCo invoice and related testimony. Yes. I thought what she was challenging was the very appearance of Ms. Bay. It isn't argued, is what I'm saying. You're trying to rehabilitate that by saying you argued it, but I'm not seeing where you argued it either. Well, but I think the result is the same if you take out the WolfCo invoice and the related testimony, whether Ms. Bay should be allowed to appear I think is not pertinent. It's the question of whether she should be allowed to testify about that subject matter. I thought the district judge was explicit that she was not excluding the WolfCo invoice. Well, that's an after-the-fact statement in her denial of the motion for a new trial. So that's not in the record either? Well, it's a problematic record. You know, I think oral hearings should be held on these type of motions. The motion asked for suppression of the e-mails and also all derivative evidence. The government should have argued during the suppression proceedings. We're arguing independent source. Your Honor, I think we need a hearing on this so we can get to the root of this, and that wasn't done. And I just don't think that the defense should be penalized for the procedure that was used here. Thank you. Thank you. In my brief, I did not make much of the sleeping jurors, although in reading the transcript, it was problematic to me because I'm a trial attorney, and if I don't have the attention of the people in the box, then I don't know what's going to happen. Okay. But I think that Judge Moore makes very good points that perhaps the district judge should have acted, even without unanimous consent, to not only chide the juror but also to remove the juror because a criminal defendant whose liberty is at stake deserves full attention for however long it takes. And I know that this was, again, I was not the trial attorney. I know that this is white collar. It's numbers. It's a little boring. People tend to go away in their world. But nevertheless, if a person's liberty is at stake, then they deserve the full attention of the jury. It makes sense if that's the position of the defendant, but what if the defendant, speaking hypothetically, thinks that the sleeping juror is the one that they wish they could have? That's Camille Harris. I understand. I'm sorry, I interrupted. What is well about the other two is that they could have expressed their opposition more strongly. Maybe they figured if Camille Harris is okay with it and we're going to have to bifurcate this trial, that wouldn't be a good thing, and so therefore, for strategic reasons, we don't object to the district court. It's not up to the district court to overturn that, is it? No, I don't think so, although no, it's not. I couldn't allow them, in effect, to say to themselves, well, it would have been nice if we got it, but we'll let it pass. Your Honor, it's not that black and white. If it's that black and white, then we've got to defer to the district court a little bit. I understand. I understand. But also, you'll notice that my third issue presented is ineffective assistance, and maybe the trial counsel should have stepped up and said, no, time out, juror's gone. We don't normally do that on direct appeal, is that correct? That's correct. So there's a sleeping juror issue, which happened somehow at a sidebar. Again, I've read the record multiple times, and I was not in the trial, so I don't know. And I would think that the district judge should proceed to get an effective court and get an effective jury. You asked a question about Summer Bay, and I'll go back to that, because we still don't know from the record how she popped up on the screen. Your opponent argued just moments ago that her name was on these documents. I don't know where the documents came from. Real estate agent. I don't know where the documents came from, and I have thought about this, and my only conclusion can be that they came through the Microsoft and Google accounts. Otherwise, there would be no way that the government would know that Summer Bay, Shannon Lee, Shannon Woods ever existed if there wasn't some sort of communication. This was not an enormous enterprise. This was actually two people, Camille Harris, who was in charge of AmeriBuild, and Kenneth Embry, who was in charge of WolfCo, and my client, who actually lived in the house in Waxhaw, North Carolina. Did Harris live in the house, too? No. She was in Ohio. She was the mother of your client's children, a couple of them. Some of them, apparently. It wasn't like they were total strangers. No, they were not total strangers. They were not total strangers. But as for any kind of financial flow or money laundering, my client is not involved in that, and I can't find it in the record. If I could, I would not be standing here before you. I would not have taken this appeal. I see my time is up. Thank you, counsel. Thank you. The case will be submitted. Clerk may call the next case.